8007

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **LAIBA KHALIQ** **Plaintiff,** **vs.** **LAKE ERIE COLLEGE OF OSTEOPATHIC MEDICINE** **Defendant.** | **Civil Action No.** 19-180 E **COMPLAINT** **FILED UNDER SEAL** **JURY TRIAL DEMANDED** |

FILED
JUN 21 2019
CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

On behalf of The United States of America, Plaintiff and Relator Laiba Khaliq ("Relator") files this *qui tam* Complaint under the federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA") against defendants Lake Erie College of Osteopathic Medicine ("LECOM" or "Defendant"), and alleges as follows:

## I. INTRODUCTION

1. Defendant LECOM, a provider of education in the field of osteopathic medicine, routinely requires that its students perform a variety of medical services without any supervision or oversight by licensed physicians. During clinical internships, LECOM students—who have not completed a medical education and who are not licensed to practice medicine—evaluate patients, write prescriptions, impose dietary restrictions, place orders for nursing staff to perform tasks, and order lab tests, all without a licensed physician present, and without oversight or supervision of a licensed physician.

2. As a result of this practice, Defendant LECOM has submitted false claims for payment to at least three federal programs, as it (1) bills Medicare for services performed by unlicensed medical students, (2) violated material terms of a federal grant it receives from the Health Resources and Services Administration, and (3) violated material terms of its Program Participation Agreement with the Department of Education—an agreement which facilitates LECOM's receipt of federal student financial aid.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject-matter of this action under 28 U.S.C. § 1331, as this civil action arises under federal law, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under the FCA.

4. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, as Defendant has minimum contacts with

this jurisdiction and Defendant can be found in, and transacts business within, this judicial district.

5. Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a), because the Defendant resides in this district, and the Defendant transacts business in this district.

6. The facts and circumstances which give rise to Defendant's violation of the False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media, as enumerated in 31 U.S.C. § 3730(c)(4)(A).

7. To the extent that there has been a public disclosure unknown to the Relator, the Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Relator has independent material knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this *qui tam* action based on that information. *Id.*

## III. PARTIES

8. Relator Laiba Khaliq is a full-time student at LECOM. Relator has been enrolled in the Doctor of Osteopathic Medicine (D.O.) degree program since 2016 and expects to graduate from the program in 2020.

9. Defendant LECOM was founded in 1992. The College offers degree programs in the fields of osteopathic medicine, pharmacy, and dentistry. LECOM is designated as an Institution of Higher Education by the U.S. and Pennsylvania Departments of Education. The College is accredited by the American Osteopathic Association ("AOA") and the Middle States Commission on Higher Education. LECOM's School of Pharmacy is accredited by the Accreditation Council for Pharmacy Education ("ACPE"), and its dental school is accredited by the Commission on Dental Accreditation ("CODA"), which is handled by the American Dental Association ("ADA"). LECOM has three campuses: in Erie, Pennsylvania; Greensburg,

Pennsylvania; and Bradenton, Florida. As of 2017, LECOM enrolled 2,281 students in the college of medicine, and an additional 1,913 students in the school of pharmacy, school of dental medicine, and graduate studies. LECOM is a wholly owned subsidiary of Millcreek Health Systems, Inc. d/b/a LECOM Health.

## IV. STATUTORY AND REGULATORY BACKGROUND

### A. THE FALSE CLAIMS ACT.

10. The FCA, 31 U.S.C. §§ 3729 *et seq.*, was originally enacted in 1863 during the Civil War and was substantially amended by the False Claims Amendments Act of 1986, as signed into law on October 17, 1986. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the FCA. Congress acted upon finding that (a) fraud in federal programs and procurement is pervasive and that (b) the FCA—which Congress characterized as the primary tool for combating fraud in Government contracting—was in need of modernization.

11. The FCA is the Government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N 5266.

12. The FCA provides that any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $22,363 for each such claim, plus three times the amount of the damages sustained by the Government, including attorneys' fees. *See* 31 U.S.C. § 3729(a)(1); 28 CFR § 85.5.

13. The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action on behalf of the Government. A person who brings a qui tam suit under the FCA as a relator on behalf of the Government is entitled to share in any recovery.

14. A *qui tam* complaint is to be filed under seal for sixty days (without service on the Defendants during such sixty-day period). This enables the Government (a) to conduct its own investigation without Defendants' knowledge or awareness, and (b) to determine whether to join the action.

15. The FCA was further amended by the Fraud Enforcement Recovery Act ("FERA"), passed by Congress and signed into law on May 20, 2009, for the express purpose of strengthening the tools available to combat fraud and to overturn judicial decisions that had weakened the False Claims Act. Pub. L. No. 111-21, 123 Stat. 1617 (2009).

16. In its current form, the FCA subjects to liability any person who (a) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (b) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or (c) "conspires to commit" a violation of these two provisions. 31 U.S.C. § 3729(a)(1).

17. To establish that a defendant acted "knowingly" under the FCA, no "proof of specific intent to defraud" is required; it is sufficient when a defendant knows that information provided is false, acts in deliberate ignorance of its truth or falsity, or acts in reckless disregard of its truth or falsity. 31 U.S.C. § 3729(b)(1).

18. For purposes of the FCA, a "claim" is any request for money submitted to the contract, which covers both false claims made while entering into a contract with the federal Government as well as claims for payment under an existing contract. 31 U.S.C. § 3729(b)(2).

**B. THE MEDICARE PROGRAM.**

**1. Program Overview.**

19. In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*., known as the Medicare program. Medicare is a federal health insurance program that pays for covered medical care provided to eligible individuals. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1. Medicare is administered by Centers for Medicare and Medicaid Services ("CMS"), which is part of the Department of Health and Human Services ("HHS").

20. Medicare operates by authorizing payments in accordance with government established conditions and rates for covered inpatient and outpatient healthcare services to "providers," such as hospitals, skilled nursing facilities, outpatient rehabilitation facilities, and home health agencies. 42 U.S.C. §§ 1395cc(a), (e), 1395x(u); *see also* 42 C.F.R. § 400.202. Two major parts of Medicare—Parts A & B—pay for medical items and services on a "fee-for-service" basis.

21. Medicare Part A is provider insurance that helps cover certain types of care provided by institutional providers within specified limits. *See* 42 U.S.C. § 1395c *et seq*. Specifically, Medicare Part A authorizes payments for covered inpatient services.

22. Medicare Part B establishes a voluntary supplemental insurance program that pays for various medical and other health services and supplies, including physician services, physical, occupational, and speech therapy services, and hospital outpatient services. *See* 42 U.S.C. §§ 1395k, 1395m, 1395x.

23. In order to participate in the Medicare program, a healthcare provider must enter into an agreement ("Provider Agreement") with the Secretary of HHS. 42 U.S.C. § 1395cc. After entering into a Provider Agreement, Medicare pays a pre-determined rate directly to the provider for covered inpatient and outpatient services provided to Medicare beneficiaries, minus any deductible or coinsurance, which are collected directly from the beneficiaries. *Id.*

24. In order to qualify for payments by Medicare for services provided, providers must submit an enrollment application to the program on Form CMS 855A. Among other things, this application requires providers to sign a certification that states in relevant part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . and on the provider's compliance with all applicable conditions of participation in Medicare.[1]

25. Additionally, when submitting claims for reimbursement to Medicare, the provider is required to certify on Form CMS 1500 that: (1) the information on the form is true, accurate and complete; (2) sufficient information is provided to allow the government to make an informed eligibility and payment decision; (3) the claim complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment; and (4) the services on the form were medically necessary. Form CMS 1500 further requires the provider to certify that the services on the form were "personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare."[2]

---

[1] CMS 885A, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf (last visited May 23, 2019).

[2] CMS 1500, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/CMS1500805.pdf (last visited May 23, 2019).

**2. Medicare Reimbursement Rules Governing Student Participation in the Provision of Medical Services.**

26. Skilled Nursing Facilities ("SNFs") are "Providers" within the meaning of 42 U.S.C. §§ 1395cc(e) and 42 C.F.R. § 400.202.[3] SNFs receive substantial payments from the U.S. Government under both parts of the Medicare program (i.e., part A and part B) for the medical services they provide to the elderly.

27. SNFs can employ "teaching physicians," licensed physicians who involve residents in the care of their patients. CMS Manual § 100. "Residents" are individuals who participate in an approved graduate medical education program ("GME"). *Id.* Entrance into a GME requires completion of a post-secondary medical degree program (i.e., a Doctor of Medicine (M.D.) or Doctor of Osteopathic Medicine (D.O.) program).

28. Furthermore, SNFs may also include medical students—individuals enrolled in a medical education program who have not yet completed their course of study, and thus do not and cannot qualify as "residents"—in the process of providing medical services to covered patients. *Id.* However, "[a]ny contribution and participation of a student to the performance of a billable service . . . must be performed in the **physical presence of a teaching physician or physical presence of a resident** in a service meeting the requirements . . . for teaching physician billing." CMS Manual § 100.1.1(B) (emphasis supplied).

29. For a physician or resident to be "physically present," he or she must be "located in the same room (or partitioned or curtained area, if the room is subdivided to accommodate multiple patients) as the patient and/or performs a face-to-face service." CMS Manual § 100.

30. CMS imposes strict limits both on what role students can play in providing medical services and on the use of students' notes. Students who participate in the provision of medical

[3] The Provider Number of the Senior Living Facility operated by Defendant LECOM is 396072.

services billed to the Medicare program may document the services in the medical record. CMS Manual § 100.1.1(B). However:

> [T]he teaching physician must **verify** in the medical record all student documentation or findings . . . [And] [t]he teaching physician must **personally perform** (or re-perform) the physical exam and medical decision activities of the [] services being billed . . .

*Id.* (emphasis supplied).[4]

31. As these restrictions make clear, students (in contrast to residents) are not allowed to participate in the provision of billable services without direct supervision of licensed physicians or residents who are physically present, and CMS makes explicit that "Medicare does not pay for any services furnished by [students]." CMS Manual § 100.[5]

32. Consequently, any claim for payment submitted to the Medicare program for services performed by a medical student that was not directly supervised by a physician or resident who was physically present violates Medicare regulations and program instructions. Furthermore, while the medical record may contain notes written by medical students, a physician must have verified all documentation and findings the student entered. As noted above, providers certify compliance with these and other regulations and instructions both when they apply for institutional eligibility by submitting Form CMS 855A and every time they submit a claim for reimbursement on Form CMS 1500.

---

[4] CMS changed the Manual in 2018 to alleviate the administrative burden on physicians; under the prior edition, teaching physicians were required not just to verify but also to re-document the exam and the medical decision-making. *See* E/M SERVICE DOCUMENTATION PROVIDED BY STUDENTS (MANUAL UPDATE), CMS MLN, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/MM10412.pdf (last visited May 23, 2019); Conor Duffy, *CMS Announces Change to Student Documentation Requirement Intended to Reduce Burden on Teaching Physicians*, HEALTH LAW DIAGNOSIS (Feb. 14, 2018), https://www.healthlawdiagnosis.com/2018/02/cms-announces-change-to-student-documentation-requirement-intended-to-reduce-burden-on-teaching-physicians/.

[5] CMS has made clear, when providers sought clarification, that while "[u]nder Medicare, services by students are not billable," teaching physicians nonetheless "can involve students in services they personally perform." And "[t]o the extent that a medical student is involved in procedures under the personal supervision of the teaching physician who is performing the service, there is no prohibition against the teaching physician billing for these services." *See* UW MEDICINE GUIDANCE DOCUMENT: BILLING FOR PROCEDURES WHEN MEDICAL STUDENTS PARTICIPATE (June 23, 2017), http://depts.washington.edu/comply/docs/MedStudentsAdvisory.pdf (referencing correspondence with CMS).

**3. Medicare's Prohibitions on Billing for Services Provided by Individuals Who Are Not Licensed as a Physician.**

33. Students enrolled in M.D. and D.O. programs do not have medical degrees, and are not licensed physicians. When students perform medical services that are billed to Medicare, using the credentials of a teaching physician, the institution and the physician are submitting requests for payment to the Government for services performed by individuals without a license to practice as a physician.

34. The dangers posed by the unlicensed practice of medicine finds support in 42 U.S.C. § 1320a-7b(a)(5), which imposes criminal liability for presenting (or causing to be presented) "a claim for a physician's service for which payment may be made under a Federal health care program and knows that the individual who furnished the service was not licensed as a physician."

35. Congress further granted health care program administrators the authority to "limit, restrict, or suspend the eligibility" of individuals who have been are found guilty under this provision. *Id.*; *cf.* 42 C.F.R. § 405.371(a)(2) (explaining that Medicare payments may be suspended in cases of suspected fraud).

36. Failure to observe the restrictions on participation by medical students in providing services billed to the Medicare program can serve as the basis for an enforcement action under the FCA. As the District Court for the District of Columbia observed, "a healthcare provider may be liable for submitting a false claim under the FCA for misrepresenting the credentials of the person who provided the services," and "[t]hese cases typically involve a provider representing to the Government that someone who is eligible for reimbursement provided the service, when it was actually performed by a person who is precluded from reimbursement," as, for example, when "a student provides medical treatment to a patient without being directly supervised by a licensed

physician, and the hospital that is administering the training program then submits a claim under the name and PIN number [provider identification number] of the licensed physician." *U.S. ex rel. El-Amin v. George Washington Univ.*, 522 F. Supp. 2d 135, 141 n.5 (D.D.C. 2007).

**C. OTHER GOVERNMENT-FUNDED HEALTH PROGRAMS.**

37. In addition to Medicare, the federal government reimburses a portion of the cost of medical services under several other health care programs with similar coverage requirements, including, without limitation, the Medicaid program and programs administered by the Department of Defense ("DOD"), the Department of Veterans Affairs ("VA") and the Office of Personnel Management ("OPM").

38. Medicaid is a federal and state funded health program administered by participating states that subsidizes healthcare coverage primarily for eligible low-income residents. The Medicaid program pays for services pursuant to plans developed by the states and approved by HHS through CMS. *See* 42 U.S.C. § 1396a(a)–(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *See* 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily determined percentage of "the total amount expended . . . as medical assistance under the State plan . . . " 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation.

39. Each physician who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state. Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, including the fraud and abuse provisions. Furthermore, claims for reimbursement presented by a provider to a state Medicaid program are subject to terms of certification. These terms require that the medical services for which the claims are sought were provided in accordance with applicable federal and state laws.

40. The DOD administers TRICARE (formerly CHAMPUS), a health care program covering individuals and dependents affiliated with the armed forces. The VA administers its own health program, along with CHAMPVA (a shared cost program), covering families of veterans. OPM administers the Federal Employee Health Benefit Program, a health insurance program covering federal employees, retirees, and survivors.

### D. THE GERIATRICS WORKFORCE ENHANCEMENT PROGRAM (GWEP).

41. GWEP is a program funded and administered by Health Resources and Services Administration ("HRSA"). HRSA, which falls under HHS, is "the primary federal agency for improving health care to people who are geographically isolated or economically or medically vulnerable."[6] HRSA programs are designed to "help those in need of high-quality primary health care by supporting the training of health professionals."[7]

---

[6] *Geriatrics Workforce Enhancement Program AY 2016-17*, HRSA, https://bhw.hrsa.gov/sites/default/files/bhw/health-workforce-analysis/program-highlights/geriatrics-workforce-enhancement-programs-2017.pdf (last visited May 23, 2019).

[7] *Id.*

**1. GWEP Purpose and Scope.**

42. The GWEP program "provide[s] grants that improve health care for older adults and maximize patient and family engagement to health professions schools, health care facilities, and programs leading to certification as a certified nursing assistant."[8] GWEP focuses "on transforming clinical training environments into integrated geriatrics and primary care systems with increased community engagement."[9] Specifically, the program supports "endeavors to enhance geriatrics education and training across the health professions, with an emphasis on integrating geriatrics and primary care."[10]

43. As then-HHS Secretary Sylvia M. Burwell explained when GWEP was announced, the program is designed to "promote access to quality health care for older adults by supporting their self-management, their families' engagement in their care, and the dedicated caregivers who work with them."[11] The program emphasizes "providing the primary care workforce with the knowledge and skills to care for older adults," and funding "may be used to support the education and training of health professions students, residents, fellows, and faculty; healthcare providers; and direct care workers who will provide healthcare to older adults."[12]

---

[8] *Geriatrics*, HRSA, https://bhw.hrsa.gov/grants/geriatrics (last visited May 23, 2019).

[9] *Id.*

[10] *Geriatrics Workforce Enhancement Program AY 2016-17*, HRSA, https://bhw.hrsa.gov/sites/default/files/bhw/health-workforce-analysis/program-highlights/geriatrics-workforce-enhancement-programs-2017.pdf (last visited May 23, 2019).

[11] *Press Release: HHS Awards $35.7Million to Improve Care for Older Adults*, HRSA (July 13, 2016), https://www.hrsa.gov/about/news/press-releases/2015-07-13-geriatric-workforce.html.

[12] *Geriatrics Workforce Program Notice of Funding Opportunity FY 2019*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Nov. 8, 2018), at i, https://grants.hrsa.gov/2010/Web2External/Interface/Common/EHBDisplayAttachment.aspx?dm_rtc=16&dm_attid=3c8db591-9d9e-489b-980a-a44ef4fb9ed9.

**2. GWEP Applications and Program Requirements.**

44. GWEP grant applications are to be submitted through the Grants.gov website using the SF-424 Research and Related ("R&R") workspace application package.[13]

45. The SF-424 R&R Application Guide provides that GWEP applicants are required to "[e]xplain personnel costs by listing each staff member who will be supported from funds," and must add staff members' "name[s] (if possible), position title, percentage of full-time equivalency, and annual salary."[14]

46. Applicants are further required to "present a staffing plan and provide a justification for the plan that includes education and experience qualifications and rational for the amount of time being requested for each staff position."[15]

47. Furthermore, the staffing plan must include "[p]osition descriptions that include the roles, responsibilities, and qualifications of proposed project staff," and applicants are required to "describe [their] method for ensuring that only actual work performed will be charged to the award and how that method meets federal cost principle requirements under [45 C.F.R.] § 75.430."[16]

48. Further restrictions governing GWEP grant applications are set out in the general SF-424 Application Guide.[17]

49. The SF-424 Application Guide likewise provides that applicants must include "[p]osition descriptions that include the roles, responsibilities, and qualifications of proposed

[13] *Id.* at 10. Note that use of the Grants.gov website is not mandatory, applicants are "encouraged" to use the website. *See id.*

[14] *SF-424 R&R Application Guide*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Apr. 5, 2019), at 32, https://www.hrsa.gov/sites/default/files/hrsa/grants/apply/applicationguide/sf-424-rr-app-guide.pdf.

[15] *Id.* at 36.

[16] *Id.*

[17] *Geriatrics Workforce Program Notice of Funding Opportunity FY 2019*, *supra* note 17, at 27 (noting applicability of the restrictions contained in the SF-424 Application Guide).

project staff," and applicants are required to "describe [their] method for ensuring that only actual work performed will be charged to the award and how that method meets federal cost principle requirements under [45 C.F.R.] § 75.430."[18]

50. Under 45 C.F.R. § 75.430(i)(1), all "[c]harges to Federal awards for salaries and wages must be based on records that accurately reflect the work performed." These records must be "supported by a system of internal control which provides reasonable assurance that the charges are accurate, allowable, and properly allocated," and "[r]easonably reflect the total activity for which the employee is compensated by the non-Federal entity . . ." 45 C.F.R. § 75.430(i)(1).

51. As the GWEP Notice of Funding Opportunity ("NOFO") makes clear, applications for GWEP grants are evaluated on "[t]he extent to which project personnel are qualified by training and/or experience to implement and carry out the project" for which funding is sought.[19]

52. Another factor in evaluating GWEP grant applications is "the reasonableness of the proposed budget," and part of the budget reasonableness inquiry is "[t]he extent to which key personnel have adequate time devoted to the project to achieve project objectives."[20]

### E. TITLE IV OF THE HIGHER EDUCATION ACT.

53. Congress established various student loan and grant programs under Title IV of the Higher Education Act of 1965, 29 U.S.C. §§ 1070 *et seq.* ("HEA"). In 2008, Congress reauthorized the HEA, as amended, through its passage of the Higher Education Opportunity Act. Pub. L. 110-315.

54. Under Title IV of the HEA, students may obtain guaranteed student loans to pay for post-secondary tuition and expenses. "State or non-profit agencies guarantee the repayment of

---

[18] *SF-424 Application Guide*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Apr. 5, 2019), at 31, https://www.hrsa.gov/sites/default/files/hrsa/grants/apply/applicationguide/sf-424-app-guide.pdf.

[19] *Geriatrics Workforce Program Notice of Funding Opportunity FY 2019*, *supra* note 17, at 30.

[20] *Id.* at 31.

the loans," and the Department of Education ("DOE" or "the Department") "in turn 'reinsures' the guarantee agencies, meaning that it will pay off a defaulted loan with federal funds after specified collection efforts have proven futile." *United States v. Educ. Mgmt. Corp.*, F. Supp. 2d 433, 439 (W.D. Pa. 2012) (citing *Ass'n of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859, 860 (D.C. Cir. 1992)). As a result, "the risk of defaults on student loans is borne not by the educational institution but by the students and taxpayers, who absorb any defaults." *Id.*

**1. Eligibility and Enrollment Requirements for Educational Institutions.**

55. In order to participate in Title IV's federal programs for financial aid, an institution such as LECOM must apply to the DOE for certification as an "eligible institution." Institutions must meet three conditions to be eligible for participation in Title IV's programs: (1) the institution must be licensed or otherwise legally authorized to operate in the state in which it is physically located; (2) accredited or pre-accredited by an agency recognized for that purpose by the DOE; and (3) certified by the DOE as eligible to participate in Title IV programs. 34 CFR § 600.7.

56. After receiving certification as an "eligible institution," the institution must enter into a "Program Participation Agreement" ("PPA") with the DOE. 34 C.F.R. § 668.14.

57. PPAs are written agreements between participation institutions and the Department, which condition both the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with all applicable regulations and whatever additional conditions are specified in the PPA, and thus oblige the institution to "comply with all the relevant program statutes and regulations governing the operation of each Title IV . . . Program in which it participates." *Educ. Mgmt. Corp.*, F. Supp. 2d at 439 (citing *Alexander*, 979 F.2d at 860); *see also* 34 C.F.R. § 668.14(a)(1), (b)(1).

58. The PPA imposes a duty on participating institutions to certify their continuing compliance with the terms of the agreement (which by its terms incorporates both Title IV of the

HEA and all applicable regulatory provisions prescribed under that statutory authority) each time federal funds are requested.

59. An institution that is not in compliance with the terms of its PPA is ineligible to receive federal funds under Title IV of the HEA, and compliance is a precondition for receiving payment. *See United States v. Ctr. for Employment Training*, No. 213CV01697KJMKJN, 2016 WL 4210052, at *8 (E.D. Cal. Aug. 9, 2016); *United States ex rel. Munoz v. Computer Sys. Inst., Inc.*, No. 11-CV-7899, 2013 WL 5781810, at *5–6 (N.D. Ill. Oct. 25, 2013); *United States ex rel. Sobek v. Education Management*, LLC, 2013 WL 2404082, at *3, *10 (W.D. Pa. May 31, 2013).

**2. Regulations Concerning Substantial Misrepresentations to Students.**

60. By their terms, all PPAs—including the PPA that enables LECOM to participate in the Title IV Student Financial Assistance program—incorporate Subpart F of 42 C.F.R Part 668, entitled "Misrepresentations."

61. 42 C.F.R. § 668.71(c) defines misrepresentations as "[a]ny false, erroneous or misleading statement an eligible institution, one of its representatives, . . . or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public," and adds that "[a] misleading statement includes any statement that has the likelihood or tendency to deceive," and that "[a] statement is any communication made in writing, visually, orally, or through other means."

62. To be actionable, a misleading statement by an eligible institution must be "substantial," which requires that the misrepresentation is one "on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id.*

63. Actionable misrepresentations include misrepresentations about the nature of the educational program the institution offers, a category that includes the following:

> (g) The availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet; . . .
>
> (i) The number, availability, and qualifications, including the training and experience, of its faculty and other personnel; . . . .
>
> (k) The nature and availability of any tutorial or specialized instruction, guidance and counseling, or other supplementary assistance it will provide its students before, during or after the completion of a course; . . . . [and]
>
> (m) The subject matter, content of the course of study, or any other fact related to the degree, diploma, certificate of completion, or any similar document that the student is to be, or is, awarded upon completion of the course of study; . . . .
>
> 42 C.F.R. § 668.72.

64. When an eligible institution such as LECOM makes a substantial misrepresentation to a student, the Department may impose a fine of up to $25,000 per violation and limit, suspend, or altogether terminate the institution's participation in the Title IV student financial aid program, among other measures. *See* 42 C.F.R. §§ 668.71(a)(4), 668.81(a)(3)–(4); *see also* 20 U.S.C. § 1094(c)(3)(A)-(B).

65. Furthermore, making substantial misrepresentations about the nature of an educational program to students in violation of 42 C.F.R. §§ 668.71–72 can serve as the basis for an enforcement action against the offending institution under the FCA. *See, e.g.*, *United States v. Ctr. for Emp't Training*, No. 213CV01697KJMKJN, 2019 WL 424189, at *6–11 (E.D. Cal. Feb. 4, 2019); *U.S. ex rel. Lynn v. Delta Career Educ. Corp.*, No. CV-15-719-PHX-SMM, 2017 WL 2455210, at *7–8 (D. Ariz. Mar. 15, 2017).

## V. SUBSTANTIVE ALLEGATIONS

66. As a matter of longstanding practice, Defendant LECOM requires that students enrolled in medical degree programs perform a variety of medical services without any supervision or oversight by licensed physicians.

67. All LECOM students enrolled in the Doctor of Osteopathic Medicine (D.O.) degree program must complete a clinical internship in geriatric medicine, which is internally referred to as a "Geriatric Rotation." As part of the mandatory Geriatric Rotation, LECOM students—who have not completed a medical education and who are not licensed to practice medicine—are expected to evaluate patients, write prescriptions, order lab tests (including blood work and urine screens), place orders for the nursing staff to perform tasks (including putting in foley catheters and performing bladder scans) and impose dietary restrictions (including fluid restrictions), all without a licensed physician present, and without oversight or supervision of a licensed physician.

68. Completing the Geriatric Rotation is a graduation requirement for D.O. students at LECOM. Students are evaluated for their performance during the rotation, and receive a grade for their performance.

69. On information and belief, LECOM is the only institution of higher education in the U.S. which requires that students enrolled in a medical degree program complete an internship in geriatric medicine, and LECOM markets itself specifically to aspiring medical students with an interest in geriatric medicine.

70. Relator completed a Geriatric Rotation in September and October 2018, which included a 24-hour shift at LECOM Senior Living Center (the "Senior Living Center") on October 7–8, 2018.[21] During this internship, Relator evaluated patients, wrote prescriptions, and proscribed other medical treatment without a physician present, and without supervision of a physician.

71. The Senior Living Facility uses the online service BlueStep as the program which documentation and physician orders are recorded. Relator recorded the services she provided during her shift in BlueStep in the patient progress notes for the patients she treated, under the login credentials of Dr. John M. Ferretti, the President and CEO of LECOM.

72. On information and belief, countless other LECOM students were expected to provide medical services without supervision of a licensed physician during completion of their mandatory Geriatric Rotation, and in fact provided such services.

73. On information and belief, these students all used the login credentials of President Ferretti to record their actions in BlueStep, and Dr. Ferretti has specifically made his credentials available to students for purposes of enabling them to enter medical services they provided to the Senior Living Facility's patients in his absence, and without his supervision, into the Facility's BlueStep system under his credentials.

74. As a direct consequence of this well-established and pervasive practice that has been sanctioned by LECOM's leadership, LECOM has knowingly (a) billed Medicare and other governmental health insurance programs for services performed by unlicensed medical students on numerous occasions, (b) violated material terms of a federal grant LECOM receives from the

---

[21] Relator was assigned to the Geriatric Psychiatry unit in the Millcreek Community Hospital for the duration of her Geriatric Rotation, a facility directly adjacent and connecting to the Senior Living Facility. All students completing a Geriatric Rotation, irrespective of their specific assignment, are required to complete at least one 24-hour shift in the Senior Living Facility. Some students complete their entire rotation in the Senior Living Facility, while other students (including Relator) only work in the Facility for one mandatory 24-hour shift.

Health Resources and Services Administration, and (c) violated material terms of its Program Participation Agreement with the Department of Education—an agreement which facilitates LECOM's receipt of federal student financial aid under Title IV of the Higher Education Act.

### A. LECOM SUBMITTED FALSE CLAIMS TO MEDICARE AND OTHER GOVERNMENT HEALTH PROGRAMS FOR SERVICES PROVIDED BY UNSUPERVISED AND UNLICENSED MEDICAL STUDENTS.

75. LECOM not only authorized, but *required* Relator and other LECOM students completing Geriatric Rotation internships at the Senior Living Center to routinely treat patients and prescribe medications without supervision by licensed physicians. As detailed herein, Medicare rules and regulations set out strict limits on student participation in the provision of billable medical services, and as a general rule, "Medicare does not pay for any services furnished by [students]." CMS Manual § 100. LECOM violated these restrictions on numerous occasions, as its students—including Relator Khaliq—were routinely expected to perform, and routinely performed, services billed to Medicare without a physician or resident physically present. As a result, LECOM knowingly submitted numerous false claims for payment under the Medicare program, as well as under other government health care programs, including Medicaid.

76. Given that nearly all patients in the Senior Living Center are insured by Medicare, this practice necessarily caused Defendant to falsely bill Medicare for services purportedly performed by licensed physicians in its affiliated nursing facility, LECOM Senior Living Center, which are in reality performed by unlicensed medical students. As a substantial number of patients is also insured by Medicaid, the practice also caused Defendant to falsely bill Medicaid for these services. As a result, Relator was able to collect numerous examples of LECOM's fraudulent billing practices.

**1. LECOM Students Were Expected to Write and Modify Prescriptions Without Supervision from a Licensed Physician.**

77. Medical students, including Relator Khaliq, were expected to write or modify prescriptions for patients insured by Medicare and/or Medicaid on numerous occasions, all without a licensed physician (or resident) physically present, and without any supervision from a licensed physician. For example:

78. On September 29, 2018, Student A prescribed 25 milligrams of Hydralazine to Patient 1 under the credentials of Dr. John Ferretti.

79. On September 29, 2018, Student A prescribed 1000 milligrams of Levetiracetam to Patient 1 under the credentials of Dr. John Ferretti.

80. On September 29, 2018, Student A prescribed 30 milliliters of magnesium hydroxide (listed as "milk of magn sus") to Patient 1 under the credentials of Dr. John Ferretti.

81. On September 29, 2018, Student A prescribed 650 milligrams of Acetaminophen to Patient 1 under the credentials of Dr. John Ferretti.

82. On September 29, 2018, Student A prescribed 10 milligrams of a bisacodyl suppository (listed as "bisac-evac sup 10mg") to Patient 1 under the credentials of Dr. John Ferretti

83. On September 29, 2018, Student A prescribed 17.2 milligrams of Senna glycoside (listed as "Senna tab 8.6m") to Patient 1 under the credentials of Dr. John Ferretti.

84. On September 29, 2018, Student A prescribed 60 milliliters of lactulose solution (listed as "lactulose sol 10gm/15") to Patient 1 under the credentials of Dr. John Ferretti.

85. On September 30, 2018, Student A prescribed 10 milligrams of Lisinopril to Patient 1 under the credentials of Dr. John Ferretti.

86. On September 30, 2018, Student A prescribed 0.4 milligrams of Tamsulosin to Patient 1 under the credentials of Dr. John Ferretti.

87. On October 4, 2018, Student B prescribed 1 milligram of Scopolamine Transdermal Patch to Patient 1 under the credentials of Dr. John Ferretti.

88. On October 7, 2018, Relator Khaliq prescribed 200 milligrams of a Colace Oral Capsule to Patient 1 under the credentials of Dr. John Ferretti.

89. On October 7 or 8, 2018, Relator, after receiving blood coagulation results that she believed belonged to Patient 2, discontinued Patient 2's Warfarin prescription, and restarted the medication upon realization of the mistake, all under the credentials of Dr. John Ferretti.

90. On October 7, 2018, Relator modified the dosage of Patient 3's Lantus prescription a nurse reported that Patient 6 had a blood glucose reading of 400 mg/dL, under the credentials of Dr. John Ferretti.

91. On October 7, 2018, Student C adjusted the prescription for Warfarin from 7.5 milligrams to 7 milligrams under the credentials of Dr. Ferretti. The prescription was entered in Health Fusion, an electronic medical record system used by Dr. Ferretti. Dr. Michael Roesel provided these credentials to Student C.

92. On October 10, 2018, Student D prescribed 500 milligrams of Amoxicillin Oral Capsule to Patient 1 under the credentials of Dr. John Ferretti.

93. Medical students were expected to prescribe medication irrespective of whether the prescriptions were subject to the restrictions of the Controlled Substances Act, 21 U.S.C. §§ 812 *et seq*. For example:

94. On October 5, 2018, Student B prescribed 0.25 milliliters of Morphine Sulfate (Concentrate) Oral Solution to Patient 1 under the credentials of Dr. John Ferretti.

95. On October 7 or 8, 2018, Relator prescribed Hydrocodone for Patient 4 under the credentials of Dr. John Ferretti. Hydrocodone is a Schedule II controlled substance.

96. On October 7 or 8, 2018, Relator discontinued a Lorazepam prescription for Patient

5 and prescribed Vistaril for this patient under the credentials of Dr. John Ferretti. Lorazepam is a Schedule IV controlled substance.

97. On October 7 or 8, 2018, Relator modified Patient 6's Temazepam prescription from "at bedtime" to "as needed" under the credentials of Dr. John Ferretti. Temazepam is a Schedule IV controlled substance.

98. These prescriptions were all entered into the Senior Living Facility's recordkeeping software system, BlueStep, using the credentials of Dr. John M. Ferretti, the President and CEO of LECOM. Dr. Ferretti's credentials are made available to all LECOM students working in the Senior Living Facility, enabling them to record the medications they prescribe without oversight or supervision of a licensed physician, and without a physician present. On information and belief, Dr. Ferretti has made his credentials available precisely for the purpose of enabling LECOM students to enter prescriptions in his absence, and without supervision from a licensed physician.

**2. LECOM Students Were Expected to Perform Various Other Billable Actions Without Supervision from a Licensed Physician.**

99. Medical students were not only expected to prescribe medications to patients at the Senior Living Facility without a licensed physician present to supervise them, but also performed other actions billed to Medicare and/or Medicaid, including evaluating patients, ordering lab tests (including blood work and urine screens), placing orders for nursing staff to perform tasks (including putting in foley catheters, taking x-rays, and performing bladder scans), and imposing restrictions on diets (including fluid restrictions)—all without a licensed physician (or resident) present, and without supervision from a licensed physician (or resident). For example:

100. On October 7 or 8, 2018, Relator wrote progress notes about a cough of Patient 7 and entered these patient progress notes BlueStep under the credentials of Dr. John Ferretti.

101. On October 7 or 8, Relator ordered a complete blood count for Patient 8, and, upon receiving the results, discharged Patient 8 to UPMC Hamot, a hospital in Erie, for anemia. Notes concerning the decision to discharge Patient 8 were entered into BlueStep under the credentials of Dr. John Ferretti.

102. On October 11, 2018, Student D evaluated Patient 7 and instituted a 2000-milliliter fluid restriction for 24 hours under the credentials of Dr. John Ferretti.

103. On October 11, 2018, Student D evaluated Patient 9 and prescribed the use of foam underneath a surgical dressing under the credentials of Dr. John Ferretti.

104. On information and belief, Defendant LECOM billed Medicare for these services, which were provided by Relator and other LECOM students without supervision from a licensed physician (or resident), and without a licensed physician (or resident) physically present.

105. On information and belief, Defendant LECOM also billed Medicaid for services that were performed by Relator and other LECOM students without supervision from a licensed physician (or resident), and without a licensed physician (or resident) physically present.

### 3. The Only Supervisor Available to LECOM Students During Night Shifts Is a Resident Located in an Adjacent Facility who Is Reachable Only by Text Message in Case of an Emergency.

106. When starting their 24-hour night shifts at the Senior Living Center, such as the shift completed by Relator on October 7–8, LECOM medical students are instructed to simply fend for themselves, and told they should reach out to the resident who is overseeing the adjacent hospital during this time only in case of an acute emergency.

107. The resident, who represents the sole source of supervision for the unlicensed LECOM students working night shifts in the Senior Living Facility, is simultaneously overseeing the adjacent facility, and reachable only via text message.

108. On October 7 or 8, Patient 10 fell down, and Relator ordered x-rays to assess Patient 9's injuries. Relator considered this incident to constitute an emergency sufficiently serious to justify contacting the resident via text message.

109. The text message exchange between Relator and the resident concerning the actions Relator took to address the injuries sustained by Patient 10 and an in-person conversation between Relator and the resident in which the two agreed that an order for an x-ray should be placed constituted the only supervision that Relator received throughout the 24-hour shift she completed at the Senior Living Facility.

110. The resident was not present when Relator evaluated Patient 10, did not perform an independent evaluation of Patient 10, and did not review the notes entered by Relator into BlueStep concerning the incident and the steps taken by Relator to address Patient 10's injuries.

111. The services provided to Patient 10 by Relator to address Patient 10's injuries were billed to Medicare and/or Medicaid.

**4. LECOM's Practice of Expecting Medical Students to Perform Billable Services is Longstanding and Sanctioned by LECOM Leadership.**

112. The medical services provided by Relator and other students completing the Geriatric Rotation alongside Relator were not isolated incidents, but instead part of a longstanding and pervasive practice which is sanctioned by LECOM's senior leadership.

113. On information and belief, Defendant LECOM billed Medicare, Medicaid, and/or other Government Health Insurance Programs for numerous other services performed by LECOM students completing clinical internships in the Senior Living Center without supervision of a licensed physician, and without a licensed physician physically present.

114. On information and belief, Dr. John Ferretti, who is nominally supervising medical students completing internships in the Senior Living Center, is physically present at the Center

between 7:00 am and noon Monday through Friday, leaving students completing internships to their own devices at all other times.

115. On information and belief, when Dr. Ferretti is not present, no other licensed physician or resident is present to supervise medical students in the Senior Living Center, and students are expected to (a) provide medical services to the Center's patients, and (b) record the medications they prescribe and the other actions the perform in BlueStep under the credentials of Dr. Ferretti. These services are (c) subsequently billed to Medicare, Medicaid, and/or other Government Health Insurance Programs, as if they had been performed by Dr. Ferretti.

116. On information and belief, the practice of expecting medical students to perform billable services without supervision while completing internships at the Senior Living Center dates back at least to the creation of the Center in 2015. The fact that students will be expected to write prescriptions and perform other medical services without supervision is well-known among LECOM students. Prior to starting her Geriatric Rotation, Relator was informed by two fellow students, Student E and Student F, that she would be expected to prescribe medication without the supervision of a licensed physician. Relator was further informed by a former LECOM student, Student G, that Relator would be expected to prescribe medication and perform other services without supervision of a licensed physician during the Geriatric Rotation, and that Relator would be "kicked out of school" if she refused to conform to these expectations.

117. As Dr. Ferretti, whose credentials students are expected to use, is the President and CEO of LECOM, the College's practice of expecting students to perform billable medical services without supervision from a licensed physician is not merely known to LECOM's senior leadership, but in fact sanctioned by the leadership of the College.

118. The practice of expecting students to perform billable medical services without supervision from a licenses physician was also brought to the attention of LECOM's senior

leadership as a result of a site visit by the Commission on Osteopathic College Accreditation ("COCA"), a private organization that accredits Colleges of Osteopathic Medicine.[22] During a COCA site visit to LECOM in 2018, in a meeting between COCA representatives and LECOM students, a LECOM student raised concerns about the practice of expecting students to prescribe medication under a physician's name. On information and belief, COCA representatives brought the student's concerns to the attention of LECOM senior leadership.

### B. LECOM MATERIALLY VIOLATED THE TERMS OF ITS GWEP GRANT.

119. Defendant LECOM's activities not only resulted in the submission of false claims to the Medicare program (and other Government Health Insurance Programs, including Medicaid), but also to the Health Resources and Services Administration, in the form of false certifications in its application and re-application for the federal grant that funds the project that encompasses the Senior Living Facility.

#### 1. The LECOM LIGHT Project.

120. In 2015, Defendant LECOM established the Lake Erie Integrated Geriatrics Health Team ("LIGHT") project, which serves to "provide[] a platform for integrating geriatric primary care with Home and Community Based Services ("HCBS"), other caregiver supports, and a revitalized geriatrics training landscape that includes external educational institutions."[23]

121. As part of the LIGHT project, LECOM "collaborates with numerous community-based organizations and neighboring institutions," including "multiple nursing schools, Area

---

[22] COCA is recognized by the Department of Education as an accreditation body for Colleges of Osteopathic Medicine. However, COCA is not itself a governmental entity, and is not an agency to which any claims for payment have been submitted by LECOM.

[23] *About the Lake Erie Integrated Geriatrics Health Team*, LECOMHEALTH, https://light.lecomhealth.com/about/ (last visited Mar. 13, 2019).

Agencies on Aging . . . in several counties, and local non-profit organizations . . ."[24]

122. What this means in practice is that LECOM students complete internships at external geriatric care facilities, including but not limited to the Senior Living Center.[25] According to the school's website:

> During this geriatric rotation, students work alongside of SLC physicians and nurses as they experience the scope of care that our professionals provided each geriatric patient. Students follow the patient throughout the day by attending physical therapy, occupational therapy, and cognitive therapy sessions and even engaging in an evening meal with the residents. Students gain medical knowledge as they engage with the geriatric population using direct hands on [sic] learning under the guidance of a licensed physician.[26]

123. As noted above, Relator completed a "Geriatric Rotation" in September and October 2018, which included a 24-hour shift at the Senior Living Center in October 2018. The "Geriatric Rotation" that all LECOM students must complete is facilitated through the LIGHT project.

124. LECOM's LIGHT project is funded by a federal grant from the Geriatrics Workforce Enhancement Program ("GWEP").[27]

**2. GWEP Grant No. U1QHP28711.**

125. LECOM was first awarded GWEP grant No. U1QHP28711 in 2015.

126. LECOM has received an average amount of approximately $750,000 annually in 2015, 2016, 2017, and 2018. By Summer 2018, the total grant funds awarded under LIGHT had exceeded $3,270,000.

---

[24] *Id.*

[25] *Geriatric Medicine Rotation Is a Big Hit!*, LECOMHEALTH (July 14, 2017), https://light.lecomhealth.com/geriatric-medicine-rotation-is-a-big-hit/.

[26] *Id.*

[27] *Geriatrics Workforce Enhancement Program*, LECOMHEALTH, https://light.lecomhealth.com/gwep-geriatrics-workforce-enhancement-program/ (last visited Mar. 13, 2019).

127. The funding provided by GWEP grant no. U1QHP28711 has "made [the LIGHT project] possible."[28]

128. To obtain GWEP grant no. U1QHP28711, LECOM had to submit an application that conformed to the requirements discussed above, including (a) an explanation of personnel costs; (b) a staffing plan which encompasses "[p]osition descriptions that include the roles, responsibilities, and qualifications of proposed project staff"; (c) a justification for the staffing plan that covers the "education and experience qualifications and rational for the amount of time being requested for each staff position"; and (d) a description of LECOM's "method for ensuring that only actual work performed will be charged to the award and how that method meets federal cost principle requirements."[29]

129. In addition, after obtaining the grant, any and all charges to the funds "for salaries and wages must be based on records that accurately reflect the work performed," and these records must be "supported by a system of internal control which provides reasonable assurance that the charges are accurate, allowable, and properly allocated," and reasonably reflect "the total activity for which the employee is compensated" by LECOM. 45 C.F.R. § 75.430(i)(1).

130. Submitting an application for a GWEP grant, and accepting federal funds upon being awarded the grant, entails express and/or implied certifications of compliance with these requirements.

---

[28] *About the Lake Erie Integrated Geriatrics Health Team*, *supra* note 22.

[29] *SF-424 R&R Application Guide*, *supra* note 14, at 32, 36.

### 3. LECOM Presented False Certifications in Securing a GWEP Grant for the LIGHT Project.

131. As detailed herein above, LECOM systematically used medical students who were completing Geriatric Rotations in the LIGHT Project to evaluate and treat patients and prescribe medications at the Senior Living Facility without supervision by licensed physicians.

132. Specifically, Relator Khaliq evaluated patients and prescribed medication, provided instructions to nursing staff, imposed dietary restrictions, and provided medical treatment, all without supervision of a licensed physician, and without a licensed physician present throughout the shift she completed in the Senior Living Center in October 2018 as part of her mandatory Geriatric Rotation. Other LECOM students also provided numerous medical services without supervision of a licensed physician during their Geriatric Rotations in the Senior Living Center.

133. Medical students completing Geriatric Rotations in the LIGHT project performed tasks using the access and billing information of the physicians that should have been supervising their actions, and thus performed responsibilities assigned to those physicians, while lacking the qualifications necessary to be assigned those responsibilities and perform the associated tasks.

134. On information and belief, because it routinely used unqualified and unlicensed medical students to perform the responsibilities of licensed physicians, LECOM made false representations in the staffing plan and explanation of personnel costs that it was required to submit as part of its application for GWEP grant no. U1QHP28711—the grant that provided critical funding for the LIGHT project.

135. On information and belief, because it routinely used unqualified and unlicensed medical students to perform the responsibilities of licensed physicians, LECOM made charges to the funds provided by its GWEP grant for salaries and wages for those physicians that were not

based on records that accurately reflected the work performed. LECOM's records did not reflect that vital portions of the work allegedly performed by licensed physicians, for which those physicians were compensated out of funds provided by the GWEP grant, was instead performed by unqualified medical students. As a result, LECOM's records did not and could not have reflected "the total activity for which the employee is compensated" by LECOM—in clear violation of 45 C.F.R. § 75.430(i)(1).

136. Had HRSA been aware of the misrepresentations in LECOM's application for the GWEP grant, the charges to the funds received, and the records that reflect those charges, HRSA would not have awarded GWEP grant no. U1QHP28711 to LECOM.

137. GWEP grants are designed to "improve the quality of healthcare for older Americans," by (1) "[c]hanging clinical training environments into integrated geriatrics and primary care delivery systems;" (2) "[t]raining providers who can assess and address the needs of older adults and their families or caregivers at the individual, community, and population levels; and (3) "[d]elivering community-based programs that will provide patients, families, and caregivers with the knowledge and skills to improve health outcomes and the quality of care for older adults."[30]

138. LECOM directly undermined these objectives by letting unqualified medical students perform responsibilities that are reserved for licensed physicians without any physician oversight. Further, LECOM used grant money received from HRSA to compensate those physicians not only for work that did not confer the medical training contemplated by the grant, but for work they did not perform at all.

[30] *Press Release: HHS Awards $35.7Million to Improve Care for Older Adults*, supra note 11.

139. Specifically, by expecting unqualified and unlicensed students to perform medical services without supervision or oversight from a licensed physician, LECOM (1) failed to provide those students with training that would allow them to address the needs of older adults, and (2) changed the clinical training environment it provides only insofar as that it rendered that environment entirely inadequate for students who seek to receive training, and for patients expecting quality health services.

140. Due to these violations, HRSA did not receive a tangible benefit from the GWEP grant it awarded to LECOM, and whatever intangible benefit it received is impossible to calculate.

### C. LECOM MADE SUBSTANTIAL MISREPRESENTATIONS TO STUDENTS ABOUT THE NATURE OF EDUCATIONAL PROGRAMS, IN VIOLATION OF CONDITIONS FOR RECEIVING TITLE IV FUNDS.

141. LECOM's activities further resulted in the submission of false claims to the Department of Education, as LECOM received and continues to receive federal funds under Title IV of the Higher Education Act ("HEA"). Payment of Title IV funds is conditioned on an institution's certification of compliance with the prohibition on making substantial misrepresentations about the nature of the educational programs offered to students. LECOM made substantial misrepresentations to students about the nature and extent of supervision and oversight by licenses physicians in its clinical internships, in clear violation of this prohibition. LECOM's senior leadership was not merely aware of these misrepresentations, but in fact sanctioned the activities that rendered the College's representations false.

#### 1. Clinical Clerkships Like LECOM's Geriatric Rotation Program Are a Critical Component of Medical School Education and Residency Placement

142. Clinical clerkships are intended to provide students with their first experience of patient care under physician supervision in settings such as hospitals, physician offices,

ambulatory care centers, surgical centers, and health departments.[31] Such clerkships provide the foundation upon which clinical experience is built. The faculty and staff who regularly interact with students and academic administration of a medical institution, the preceptors, are responsible for ensuring that students are exposed to a complete curriculum during their clerkship and are charged with supplementing gaps in the students' experiences to facilitate comprehensive understanding of the specialty.

143. LECOM represents to prospective students and the public that its rotation program provides valuable experience in which clinical faculty teach students in hospitals, clinics, and pharmacies, allowing students to begin to practice direct patient care under appropriate supervision.[32] The College further advertises that during their clinical rotations at a variety of LECOM sites, such as LECOM Senior Living Center, students will have the opportunity to learn the responsibilities of providing high quality health care while seeing patients under the supervision of their preceptors.[33]

144. LECOM states that its network of teaching hospitals and clinics is intended to advance clinical education for all students "through first-hand experience alongside those doctors who have years of experience in providing healthcare to their patients."[34] In addition to its seven regional campuses for students in their third and fourth years of clinical education, LECOM also touts partnerships with over 100 other teaching hospitals and clinics and access to an additional 1,600 adjunct faculty members who "actively impart practice knowledge" upon LECOM's students.[35]

---

[31] *See, e.g.*, *What is a Clinical Clerkship?*, AM. COLL. OF OSTEOPATHIC FAMILY PHYSICIANS, https://www.acofp.org/acofpimis/acofporg/PDFs/News_Publications/Articles/Clinical_Clerkship_1.15.2018.pdf (last visited May 23, 2019).

[32] LECOM CONNECTION (Summer 2018), https://issuu.com/lecom_connection/docs/lcsummer2018.

[33] *Id.*

[34] *Id.*

[35] *Id.*

145. LECOM positions itself in the marketplace as a medical school with a particularly strong geriatric medicine department and has demonstrated an increased focus on geriatric care through its opening of programs such as the LECOM Senior Living Center, LECOM Senior Living Communities, LECOM Nursing and Rehabilitation Center, and the Visiting Nurse Association of Erie County.[36] As one of 44 organizations in the country to receive the Health Resources Services Administration Geriatric Workforce Enhancement Program (GWEP) Grant, LECOM compares itself to such prestigious medical institutions as Yale, Johns Hopkins, and Duke with respect to its educational and research opportunities.[37]

146. Dr. James Lin, LECOM's Vice President of Senior Services and Adult Living and Director of the LECOM Institute for Successful Aging, further describes LECOM as "the most robust geriatric fellowship program in the country because of all the services and the continuum of care that we offer," which are "raising the bar for geriatric care."[38] Dr. Lin has attempted to create "a one-stop shop for seniors in [the] region" and encourages students and residents to consider a career in geriatrics as opposed to other more popular specialties such as cardiology or surgery.[39]

**2. LECOM Applied For and Received $345,723,111 in Title IV Funding Between July 1, 2015 and June 30, 2017.**

147. In the 2016–17 Fiscal Year, running from July 1, 2016 through June 30, 2017, LECOM applied for and received $174,630,451 in Federal Direct Student Loans from the DOE. In the 2015–16 Fiscal Year, running from July 1, 2015 through June 30, 2016, LECOM applied

[36] *Id.*

[37] *Id.*

[38] Rose Raymond, *Hero Next Door: DO Revamping Geriatric Medicine in Northwest Pa.*, THE DO (Aug. 4, 2014), https://thedo.osteopathic.org/2014/08/hero-next-door-revamped-geriatric-medicine-northwest-pa/.

[39] *Id.*

for and received $171,092,660 in Federal Direct Student Loans from the DOE. The combined total of DOE funds received by LECOM between July 1, 2015 and June 30, 2017 is $345,723,111.

148. On information and belief, LECOM received comparable amounts from the DOE under Title IV of the HEA in prior fiscal years.

149. To receive in excess of $345 million in federal funds, LECOM was required to enter into a PPA with the DOE. 34 C.F.R. § 668.14. PPAs by their terms incorporate both Title IV of the HEA and all regulations implementing this title, and LECOM was required to certify its continuing compliance with the terms of the agreement when requesting these funds. Non-compliance with the terms of a PPA renders an institution ineligible for Title IV funds, and, as explained above, compliance is a precondition for receiving payment.

150. The regulations incorporated into LECOM's PPA include 42 C.F.R. § 668.72, the prohibition on "substantial misrepresentations" about the nature of the educational programs that LECOM offers. Actionable misrepresentations under this provision include misrepresentations about "[t]he nature and availability of any tutorial or specialized instruction . . . it will provide its students before, during or after the completion of a course," as well misrepresentations about "the appropriateness of . . . courses and programs to the employment objectives" that its programs are designed to meet, the "availability . . . of its faculty" and the "content of the course of study" that students are enrolled in. 42 C.F.R. § 668.72. When requesting and receiving Title IV funds, LECOM therefore certified that it had not made any actionable substantial misrepresentations.

### 3. LECOM's Substantial Misrepresentations to Relator and Other Students.

151. In the Clinical Clerkship Manual which LECOM distributes to students and makes available on its website, LECOM sets out the following General Clerkship Rules, Regulations and Procedures covering the study and training of clinical clerks during their assignment to a training institution:

- A licensed physician must supervise students . . . .

- Progress notes may be written by the students only under the direct supervision of the supervising physician. Progress notes must be countersigned within the time required by the rules and regulations of the training institution.

- Students shall not order any examinations, tests, medications, or procedures without consulting and obtaining the prior approval of the supervising physician. Students shall not write prescriptions for medicine, devices, or anything requiring the authority of a physician . . . .

- Students shall learn and perform procedures under appropriate and proper supervision, in those areas where the training institution regulations permit such instruction . . . .

- [A] clinical clerk is not a licensed physician, and all activities (orders written or given, any patient care, progress notes, etc.) in a hospital are under the supervision of an attending physician who assumes responsibility for the clinical clerk.[40]

152. The rules set out in the LECOM clinical Clerkship Manual cover the Geriatric Rotation completed by Relator and other students, and are therefore representations about a pivotal component of an educational program offered by LECOM, i.e., the D.O. program.

153. As alleged in the foregoing, completing the Geriatric Rotation is a mandatory component of the D.O. program. Students completing the rotation are evaluated on a variety of dimensions, including "professionalism," which covers the students' "commitment to professional development and ethical principles."

154. LECOM touts the "Geriatric Rotation"-program as a "big hit," stating that its students "gain medical knowledge as they engage with the geriatric population using direct hands on learning **under the guidance of a licensed physician**," and adding that while "[t]he rotation is hard work," it "is extremely rewarding to . . . the students . . . on multiple levels."[41]

---

[40] *Clinical Clerkship Manual*, LECOM (June 22, 2017), at 33–34, https://lecom.edu/content/uploads/2017/06/2017-CLINICAL-CLERKSHIP-MANUAL-Final-6-22-17.pdf.

[41] *Geriatric Medicine Rotation Is a Big Hit!*, *supra* note 24 (emphasis supplied).

155. Finally, LECOM maintains numerous billboards throughout Erie, PA, as well as the surrounding area that market the various geriatric facilities and awards that LECOM has to both prospective students and the wider public.

156. Relator relied to these representations about the nature of the educational program that she enrolled in at LECOM. Specifically, Relator relied on the above representations in deciding to enroll in the D.O.-program at LECOM. Relator expected to be provided with clinical internships under close supervision of licensed physicians, and would not have enrolled in the D.O. program had she known that LECOM would instead routinely require her to provide medical services without supervision and without a physician present.

157. Contrary to LECOM's representation that students completing clinical programs would be supervised by licensed physicians, Relator Khaliq and other students were not supervised when they prescribed or modified medication, evaluated patients, or ordered a variety of services from the Senior Living Center's nursing staff, as detailed in the foregoing.

158. Contrary to LECOM's representation that students completing clinical programs would only write progress notes under the direct supervision of a physician, Relator and other students were not supervised when they wrote notes for patients, and entered these notes into the Senior Living Facility's software, BlueStep.

159. Contrary to LECOM's representation that students completing clinical programs would not write prescriptions for medicine, Relator and other students prescribed medication for numerous patients without supervision or oversight of a licensed physician.

160. Contrary to LECOM's representations that students completing clinical programs would "learn and perform procedures under appropriate and proper supervision," and that their training would be limited to "those areas where the training institution regulations permit such instruction," Relator and other students were routinely expected to perform evaluations of patients

and prescribe medication without any supervision (let alone proper supervision), in clear violation of applicable rules and regulations, as detailed herein above.

161. Because the representations in the Clinical Clerkship Manual about the educational program Relator was enrolled in were false, Relator's reliance on these representations was to her detriment. LECOM's misrepresentations entail that students receive a medical education that is of significantly less value than the education they expected to receive, as students were not provided with high-quality clinical internships, but instead received sub-standard, unsupervised training. These misrepresentations were, therefore, substantial under 42 C.F.R. § 668.71(c).

162. Lack of supervision in clerkships also deprives medical students of guidance that helps them develop skills and competencies necessary to become skilled physicians. Under the supervision of experienced doctors, students learn to craft a list of relevant differential diagnoses and a corresponding list of tests and physical examination findings that would eliminate diagnoses until the correct ailment is discovered. The teaching physician is supposed to act as a guide throughout this process, which culminates in helping the student formulate a sensible assessment of the patient. The physician concurrently teaches the medical students about the use of evidence-based medicine in creating a plan of care for the patient.

163. At LECOM, students are severely disadvantaged in that they must perform these actions independently, stunting the development of clinical skills that students are intended to build during this period of their education.

164. Relator received (and continues to receive) federal student financial assistance, paid directly to LECOM to cover Relator's tuition, while Relator is enrolled in the D.O. program. As explained above, LECOM is required to certify that it has not made substantial misrepresentations to its students as a precondition to receiving these funds, yet has made and continues to make such misrepresentations.

165. On information and belief, other LECOM students likewise relied to their detriment on the above false representations about the educational programs offered by LECOM while receiving financial assistance under Title IV of the HEA.

## VI. COUNTS

### COUNT I
### (False Claims Act 31 U.S.C. § 3729(a)(1)(A))

166. Relator Khaliq repeats and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

167. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729–32.

168. By virtue of the acts described above, Defendant LECOM knowingly submitted, and caused to be submitted, false or fraudulent claims for payment and reimbursement by the United States Government, and the United States, unaware of the falsity of the records, statements and/or claims made by Defendant LECOM, and in reliance on the accuracy thereof, paid for the aforementioned false claims because Defendant LECOM intentionally or with gross disregard for the truth (1) billed Medicare, Medicaid, and other Government-funded health insurance programs for medical services performed by unlicensed and unsupervised students, under the credentials of physicians who were not present during those services; (2) certified compliance with terms that are a condition of payment of the HRSA grants LECOM receives under the GWEP program, despite routine material violations of those terms; and (3) made substantial misrepresentations about the nature of the educational program it offers to its students.

169. As set forth in the preceding paragraphs, Defendant LECOM violated 31 U.S.C. § 3729(a)(1)(A) and have thereby damaged and continue to damage the United States Government by its actions in an amount to be determined at trial.

**COUNT II**
**(False Claims Act 31 U.S.C. § 3729(a)(1)(B))**

170. Relator Khaliq repeats and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

171. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729–32.

172. By virtue of the acts described above, Defendant LECOM knowingly made, used, or caused to be made or used, material false statements to obtain Federal Government payment for false or fraudulent claims because the Defendant (1) billed Medicare, Medicaid, and other Government-funded health insurance programs for medical services performed by unlicensed and unsupervised students, under the credentials of physicians who were not present during those services; (2) certified compliance with terms that are a condition of payment of the HRSA grants LECOM receives under the GWEP program, despite routine material violations of those terms; and (3) made substantial misrepresentations about the nature of the educational program it offers to its students, in violation of 31 U.S.C. § 3729(a)(1)(B).

173. The United States Government relied upon these statements and has been damaged and continues to be damaged in an amount to be determined at trial.

## VII. PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the qui tam Relator requests the following relief from each of the Defendants, jointly and severally, as to the federal and state claims:

A. Three times the amount of damages that the federal and state governments sustain because of the acts of the Defendant;

B. A civil penalty of not less than $11,181 and not more than $22,363 for each violation of 31 U.S.C. § 3729;

C. The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) for collecting the civil penalties and damages;

D. The Relator be awarded reasonable attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

E. Interest; and

F. Such further relief as the Court deems just and proper.

DATED: June 20, 2019

Respectfully submitted,

*/s/ Ross Brooks*
Ross Brooks
NY 3001146
Rob Van Someren Greve
DC 1617234
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, Suite 3100
New York, New York 10019
Tel: (646) 402-5650
Fax: (646) 402-5651
rbrooks@sanfordheisler.com
rvansomerengreve@sanfordheisler.com

*/s/ Margaret Coleman*
Margaret Coleman
PA 200975
**THE LAW OFFICES OF TIMOTHY P. O'BRIEN**
239 Fourth Avenue, Suite 2103
Pittsburgh, Pennsylvania 15222
Tel: (412) 232-4400
Fax: (412) 232-3730

***Counsel for Plaintiff-Relator***